# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 9, 2022 Session Heard at Lipscomb University[1]

## STATE OF TENNESSEE v. AMANDA L. MOORE

**Appeal from the Criminal Court for Sumner County**
**No. 2017-CR-118    Dee David Gay, Judge**

_____

### No. M2020-01147-CCA-R3-CD
_____

Amanda L. Moore, Defendant, appeals after a jury convicted her of two counts of vehicular assault, one count of driving under the influence ("DUI"), and one count of reckless endangerment. The trial court merged the DUI conviction into the convictions for vehicular assault. Defendant was sentenced to an effective sentence of four years. After the denial of a motion for new trial, Defendant appealed, arguing: (1) the trial court improperly admitted the results of a blood draw used by the hospital for medical treatment; (2) the trial court improperly allowed her to be questioned extensively about her driving history on cross-examination; (3) the trial court improperly allowed the State to meet with its expert during cross-examination; and (4) the trial court had improper ex parte communication with the jury during deliberation. After a review, we affirm the judgments of the trial court but remand to the trial court for entry of a judgment form for DUI.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Patrick T. McNally (on appeal), and Grover C. Collins (at trial), Nashville, Tennessee, for the appellant, Amanda L. Moore.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Ray Whitley, District Attorney General; and Bryna Landers Grand and C. Ronald Blanton, Assistant District Attorneys General, for the appellee, State of Tennessee.

_____

[1] Oral argument in this case was heard before students in the Fred D. Gray Institute for Law, Justice and Society on the campus of Lipscomb University, Nashville, TN.

# OPINION

In February of 2017, Defendant was indicted for two counts of vehicular assault, one count of DUI, and one count of reckless endangerment as a result of a car crash that took place on November 25, 2016.

*Motion to Suppress*

Before trial, Defendant filed a motion to suppress the results of a blood draw performed at the hospital as part of her medical treatment. At the hearing on the motion to suppress, Sergeant Jonathan Bellavia testified that Defendant was removed from her vehicle at the crash scene and taken via LifeFlight to Skyline Medical Center for treatment. Officers located an empty pill bottle, later determined not to have contained a narcotic, inside Defendant's vehicle, and a small bottle of liqueur on the ground next to Defendant's vehicle. Despite locating this potential evidence, Sergeant Bellavia did not seek a warrant for a blood draw.

One week after the wreck, Sergeant Bellavia sought and obtained a judicial subpoena for Defendant's medical records. The medical records included a blood draw which showed that Defendant's blood alcohol content was .176 on the night of the crash.

Ebony Harris, a phlebotomist, testified that she worked at Skyline Medical and drew the blood sample from Defendant on the night of the incident. She received instructions to draw blood while Defendant was in the emergency room. Before the blood draw, Ms. Harris ensured Defendant's identity by matching her armband with the labels generated by the computer system. There was a slight mistake in Defendant's identifying information, listing her as a 36-year-old female instead of a 26-year-old female. During a blood draw, the phlebotomist writes her initials and the time on the tubes. Demographic labels are attached to the tubes containing the patient's name, account number, and birthdate. The tubes are sealed in a biohazard bag. The samples can be delivered to the lab in three different ways: by the phlebotomist on foot, by a lab tech retrieving them from the emergency room, or by the hospital's tube system using codes. Ms. Harris did not recall the delivery method used for the samples in this case.

When the person performing the testing receives the bag, he or she enters the time into the computer and determines which lab department is in charge of testing. The results are automatically entered into the system. In Defendant's case, orders for specific blood tests were given after the blood draw at 9:20 p.m.

- 2 -

The trial court ultimately denied the motion to suppress, finding that the blood draw was performed by the hospital without state action and that the State did not unreasonably delay seeking an indictment.

*Trial*

At trial, several people testified about the events leading up to the crash, including Defendant. Stacey Keiffer of Bethpage was "heading home from work" at Holder Family Fun Center in Hendersonville on November 25, 2016. She was driving a "dually pickup truck" around 7:30 that evening headed out of Gallatin on Nashville Pike when she saw a "dark blue Jeep" next to her. The female driver, whom she identified at trial as Defendant, was sitting "real close to the steering wheel." Both vehicles turned onto Highway 31E headed toward Westmoreland. The Jeep was "kind of swerving inside her lane" and "crossed the center line" several times in the "low-speed zone" on the way out of town. As the speed limit on the road increased, Ms. Keiffer noticed that the "swerving got worse." The Jeep went across the center line several times, went off the right side of the road several times, sped up and slowed down several times, and almost came to a complete stop in the middle of the road several times. Ms. Keiffer, concerned, turned on her flashers and called 911 to report Defendant's erratic driving. She was afraid that she was about to see or be involved in an accident. Ms. Keiffer submitted a written statement to the police the day after the crash.

Chris Clouse was also leaving work at Ron Hibbard Toyota on the evening of November 25. Mr. Clouse was also headed north on Highway 31E. At around 7:15 or 7:30, his Toyota 4Runner approached a vehicle with flashing lights near the Bethpage Market. He could see the vehicle in front of the vehicle with flashing lights was "swerving over into oncoming traffic." The vehicle with flashing lights turned off to the left. At that point, Mr. Clouse was driving directly behind the swerving "dark-colored SUV." The vehicle was "driving erratically and fast." Mr. Clouse called 911 twice. Both of his calls were "dropped" because of bad cell coverage in the area. He saw the SUV go through a "confusing" intersection and then start "driving into oncoming traffic" for "two to three miles" before the crash took place.

Mr. Clouse tried to flash his lights to warn oncoming traffic and get the attention of Defendant. At the time of the crash, Defendant's vehicle was on the wrong side of the road. The other vehicle came around the curve and the two cars hit head-on. Mr. Clouse saw the crash happen, drove a little past the scene, and stopped his vehicle to attempt to block oncoming traffic. Mr. Clouse got out of his car and tried to help the victims. Defendant was unconscious. He stayed on the scene until all of the victims were taken for medical treatment.

- 3 -

Brittany Johnson was living in Sumner County in November of 2016. At the time, she worked at Subway. She was driving southbound on Highway 31 in the opposite direction of Mr. Clouse and Ms. Keiffer on the night of the wreck when she saw "headlights . . . out of place" ahead of the car in front of her. She "let off the gas" when she realized that something was not right to provide separation between her car and the white SUV in front of her. The car in front of her was hit head-on. She called 911 after she saw the impact. Ms. Johnson later gave a statement to the police.

Mandi Lynne McCann, a sign language interpreter from Henderson County, Kentucky, was also driving southbound on Highway 31 from Glasgow, Kentucky, to see Christmas lights in Tennessee. She had several members of her family in the vehicle and was following her mother, who was driving an orange Avalanche carrying a few more family members. Ms. McCann saw her mother's vehicle veer to the right. Soon after, Ms. McCann saw a vehicle coming in the opposite direction with flashing lights. Ms. McCann saw another vehicle coming toward her "head-on." Ms. McCann drove her vehicle over to the right as far as possible onto the rumble strip. She braced for impact, expecting to be hit by the oncoming vehicle. Somehow, the vehicle did not hit her vehicle. Ms. McCann turned her vehicle around and headed in the opposite direction because she "had this gut feeling that there was going to be some type of crash."

When Ms. McCann arrived at the scene of the wreck there were already other people on the scene. She jumped out of her vehicle to try to help. She tried to call 911 but the incident had already been reported. Ms. McCann checked on the driver of the white vehicle, later identified as Jerry Seepaul. It "took him a minute" but Mr. Seepaul eventually told her that he was okay. His door was locked so Ms. McCann accessed the vehicle from the backseat. The driver complained of "big pressure on [his] chest" so Ms. McCann "released the seatbelt." The driver informed her that he had his son with him in the car. Ms. McCann saw a car seat "tipped over" and a "bunch of stuff in the front seat." She did not know the age of the son at the time. Eventually, Ms. McCann saw a "hand kind of slowly" emerge from the passenger side of the vehicle. This was Mr. Seepaul's adult son, Shawn Seepaul. Ms. McCann could not get the door to the Seepauls's vehicle open but was able to reach in and remove some debris covering the passenger. Shawn Seepaul had cuts on his face. Ms. McCann stayed with the victims and talked to them until they were removed from the car.

Brandon Fletcher was a police officer in Glasgow, Kentucky on the date of the wreck. He was riding in the backseat of the orange Avalanche with his girlfriend. He was not paying attention to the road because he was riding in the backseat. As the Avalanche traveled south on Highway 31, he saw "headlights in the southbound lane coming at" them. The driver of the Avalanche swerved to get out of the way of the oncoming vehicle. The

oncoming vehicle narrowly missed them and kept going. The driver of the Avalanche turned around to follow the erratic driver. They came upon the crash site shortly thereafter.

Mr. Fletcher went to the white Dodge Durango containing the Seepauls first and checked on the driver and the passenger. They both seemed to be okay. Defendant, the driver of the other vehicle, was unconscious. The doors and windows to Defendant's vehicle were closed. Mr. Fletcher tried to shatter the window with his pocket knife. He was unsuccessful. A police officer, later identified as Officer Michael Tenpenny of the Westmoreland Police Department, arrived shortly thereafter and busted the passenger side window of Defendant's vehicle. Officer Tenpenny and Mr. Fletcher were able to access the vehicle from the passenger door. Mr. Fletcher could smell "vomit" but "didn't smell any alcohol or anything like that." They tried to ascertain the identity of the driver. Officer Tenpenny located Defendant's identification, and Defendant slightly nodded when asked to confirm her identity. Defendant was relatively unresponsive but she eventually came to when fire and EMS got her out of the vehicle.

Officer Tenpenny was acting in a dual capacity as a police officer and a paramedic on the evening of the wreck. While tending to Defendant, he noticed a "faint distinct odor" of "alcoholic beverage" but was unable to smell it until he "got down doing the C-collar and the head blocks and [ ] was right there by the head of [Defendant]." Officer Tenpenny did not include this observation in his report of the incident. He did, however, find a mini bottle of liqueur on the ground near the passenger car door of Defendant's vehicle. Sergeant Bellavia found it unlikely that the bottle came from Defendant's vehicle because the doors were closed and no vehicle windows were broken but noted that the bottle did not appear to have been outside for a long period of time.

Sergeant Jonathan Bellavia with the Westmoreland Police Department was on duty the night of the wreck. The weather was "normal, dry." He was dispatched to the crash site a little after 8:00 p.m.

When Sergeant Bellavia arrived on the scene, Deputy Partika[2] with the Sheriff's Department was already on the scene. Sergeant Bellavia described the area commonly referred to as "Westmoreland Hill" as "heavily trafficked," noting that there were "two northbound lanes" and "one southbound lane" with two curves. Sergeant Bellavia recalled that there was initially some confusion as to whether the crash occurred in the jurisdiction of the Sheriff's Department or Westmoreland. Ultimately, the Westmoreland Police Department processed the wreck.

---

[2] As far as we can tell, Deputy Partika's first name does not appear in the trial transcript.

Sergeant Bellavia quickly assessed the scene upon arrival, noting that there were two injuries in the SUV and several "good Samaritans" helping evaluate the injuries. He worked quickly to "shut down traffic and secure the scene from any further damage" based on the location of the crash site. Because Officer Tenpenny was also a paramedic, Sergeant Bellavia sent another officer to block off traffic on the north side of the hill.

Sergeant Bellavia testified that the "vomit was one indicator" that alcohol may be a factor in the crash. Additionally, "the location of the liqueur bottle that was located (on the exterior of the passenger side of Defendant's car) . . . increased the suspicion of the possibility." Sergeant Bellavia explained that it "would have been very difficult" to get a warrant for a blood draw. He noted the complexity of securing the scene, and the "long time" it takes to get a search warrant. In particular, he testified that it would take about 20 to 25 minutes to drive to the Sheriff's Department to obtain a warrant, some time to type up the affidavit and get it signed by a magistrate, and additional time to drive "all the way out to Skyline [hospital] to execute the search warrant." In total, he estimated that it would take "at least three or four hours." In lieu of a search warrant for a blood draw, Sergeant Bellavia based his conclusion that alcohol was a factor on statements from witnesses, "the evidence of the bottle at the scene, the vomit, the 911 calls and tracking history," and medical records.

Using measurements from the scene and the "Titan computer system," Sergeant Bellavia was able to reconstruct the crash scene. He observed that only one of the vehicles, the white Dodge Durango, had made skid marks.

The Seepauls and Defendant were transported to the hospital for treatment. Mr. Seepaul suffered four broken ribs, three dislocated toes, and a cut on his chin that required eight stitches. At trial, he testified to chronic pain in his toes that prevented him from walking for long periods. Shawn Seepaul was in the hospital for two weeks as a result of a shattered left ankle, broken hip, broken femur, several broken ribs, a broken nose, and broken eye sockets. He was able to walk after a few months of physical therapy. At the time of trial, Shawn Seepaul was still in pain from the crash and experienced blurry vision in one of his eyes on occasion. As a result of the wreck, Shawn Seepaul lost his job and was unable to fulfill his obligations at the National Guard.

During treatment at the hospital, Defendant's blood was drawn. The blood alcohol content was recorded as .176 percent. At trial, there was substantial testimony regarding hospital procedures for blood draws. Proof indicated that typically, a blood draw begins with a doctor's written order. After the order is received, a phlebotomist goes to a patient, confirms their identity, and draws the blood. The blood is placed in a tube. The blood tubes are labeled, placed in a bag, and either hand-delivered to the lab or placed in the hospital's "tube system" for delivery throughout the hospital.

When a patient arrives in the emergency room, blood is usually drawn before the doctor's written orders to prioritize patient care. In Defendant's situation, blood was drawn about five minutes before the doctor's orders.

Once the blood arrives at the lab, it is removed from the tube, logged into the computer, and tested. There are several different types of tests, including chemistry, hematology, microbiology, coagulation, and blood bank. In the chemistry department, a machine called the Vista 1500 probes the blood samples, combines the blood with a reagent and generates a reading. A medical technologist verifies the accuracy of each blood alcohol test generated by the Vista 1500 machine. In Defendant's case, the testing was verified by Sharon Collett.

Ms. Collett was certified as an expert in medical technology. She was trained on the Vista 1500 but was not qualified to explain elevated blood alcohol content. Ms. Collett was unable to offer information about the possibility of cross-contamination of blood samples that could affect blood alcohol test results.

The lab director, John Daniels, was also certified as an expert in medical technology. He was in charge of policies and procedures for the lab, which tested about 2,000 blood samples daily. He noted that only 10-20 of those samples were tested for blood alcohol content each day. Mr. Daniels explained that the internal "delta check system" had a "95 percent chance" of catching mistakes if a patient was hospitalized for more than one week. He agreed that there was a possibility for "cross-contamination between ethyl alcohol and isopropyl alcohol" if a phlebotomist used isopropyl alcohol wipes for a blood draw on a blood alcohol test that could "raise the blood alcohol [content] by two to three points." Mr. Daniels testified that Defendant's blood results were limited to "medical treatment and not for prosecution in a case," pointing out that the report read that the "results should be used for MEDICAL SCREENING PURPOSES ONLY."

Mr. Daniels explained that the tests run by the Vista 1500 were "preliminary analytic test results" and that a "confirmed analytical result" could only be obtained by using a "more specific alternate chemical method" like gas chromatography. Mr. Daniels explained that this limitation did not apply to alcohol but that there were not any other methods for confirming blood alcohol results at Skyline.

The Vista 1500 was set to run internal quality control checks every 24 hours. On the day of Defendant's test, the machine was exhibiting a standard deviation categorized as "ISD" of implied standard deviation. Mr. Daniels explained that the deviation might have raised the blood alcohol content in the sample.

Mr. Daniels acknowledged that both the manufacturer of the Vista 1500 and the Food and Drug Administration ("FDA") issued recalls and updates from time to time. When a recall is issued, Mr. Daniels checks to see if the recall affected any lab results during the period specified in the recall. There was a federal recall during the time Defendant's blood was tested regarding the aliquot probe. The aliquot was explained to be a mixture of the patient's serum blood sample and the reagent. The recall warning was related to the rinsing of the probe between tests. The trial court held a recess to allow the prosecutor to discuss the recall because the State claimed that it had no notice of the recall before trial. After a break, during which the prosecutor discussed the recall with the lab director, the State objected to further cross-examination, claiming that the recall had to do with diabetes testing, and was irrelevant. The trial court sustained the objection. Mr. Daniels then testified that the recall was irrelevant to alcohol testing of blood samples.

Defendant testified at trial. At the time of the incident, she was 26 years of age and had two small children. She worked as a bartender at "Winners" in Nashville, about an hour and a half away from her home in Lafayette. The day before the crash, Thanksgiving, was busy. On the day of the crash, Defendant went "Black Friday" shopping in the early morning hours for Christmas gifts for her children. She had only had about an hour of sleep. After shopping, Defendant went to work. Defendant testified that she did not drink any alcohol on the day of the crash. In fact, Defendant testified that she never drank on the job because it was prohibited for bartenders.

Defendant denied owning the bottle of liqueur found next to her vehicle, claiming that she had never consumed that specific brand. Defendant "didn't remember" large portions of the drive home and recalled being "really tired" the day of the crash. Defendant thought that she "fell asleep" while she was driving. Defendant explained that she did not pull over to rest because of a previous incident during which she had done so and a police officer searched her car. Defendant claimed her decision to drive when she was tired was a "mistake" and admitted that she had opportunities to pull over and rest but that she wanted to "get home." Defendant suffered major injuries as a result of the crash including internal organ damage, a shattered ankle, and a cut on her knee. She had to have five surgeries after the wreck.

The jury found Defendant guilty as charged in the indictment. The trial court merged the DUI conviction into the convictions for vehicular assault. [3] After a sentencing hearing, the trial court imposed a total effective sentence of four years. Defendant filed a motion for new trial in which she challenged the admissibility of the blood draw, the use of her criminal and driving history on cross-examination, the State's conference with its expert during cross-examination, and the trial court's answer to a jury question during

---

[3] The record does not contain a judgment form for DUI.

deliberation. An amended motion for new trial was filed in which Defendant reiterated her issues with the trial and argued that the trial court improperly allowed the State to use proof that was not turned over during discovery and erred in excluding the Vista 1500 operator's manual from evidence. The trial court denied the motion. This appeal ensued. Defendant raises several issues on appeal. We will address each one in turn.

*Analysis*
*Denial of the Motion to Suppress/Admissibility of the Blood Draw*

Initially, Defendant argues that the trial court erred in denying the motion to suppress the blood draw because she was denied the opportunity to obtain a subsequent blood test pursuant to Tennessee Code Annotated section 55-10-408(e), was not warned of the consequences of submitting to a chemical test prior to the blood sample, pursuant to Tennessee Code Annotated section 55-10-406(c), and her due process rights were violated because there was a delay in presenting charges against her. The State argues that the trial court properly admitted the blood test performed during the course of medical treatment rather than as a result of state action and that none of Defendant's rights were violated.

In reviewing a motion to suppress, this Court will uphold the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court is afforded "the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). Additionally, our review of the trial court's application of the law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

As recapped above, at the hearing on the motion to suppress, Sergeant Bellavia testified that Defendant was immediately taken via LifeFlight to Skyline once she was removed from her vehicle. Sergeant Bellavia did not get a warrant for a blood draw because of the time involved to do so even though he suspected that alcohol may have been a factor in the crash. About one week after the crash, Sergeant Bellavia sought and obtained a judicial subpoena for Defendant's medical records from Skyline. The medical records revealed the blood alcohol content of Defendant's blood was .176. The investigation was completed in mid-December and the matter was presented to the grand jury in February. The trial court determined that the blood draw was performed by the hospital without state

action and that the State did not unreasonably delay seeking an indictment. As a result, the trial court denied the motion to suppress.

The exclusionary rule under both the Fourth and Fifth Amendments was designed to deter police misconduct. However, courts traditionally have acknowledged that the exclusion of evidence can impact the truth-finding function of the trial and has the potential to allow criminals to avoid punishment where there is police negligence or misbehavior. *United States v. Leon*, 468 U.S. 897, 907 (1984); *see also State v. Housler*, 193 S.W.3d 476, 489 (Tenn. 2006) (quoting *Lego v. Twomey*, 404 U.S. 477, 484 n.12 (1972)). To the benefit of defendants, however, the exclusionary rule serves to prevent police from violating constitutional rights of the accused. In fact, "evidence gathered by private persons is generally not subject to the exclusionary rule because with private action there is no police misconduct to be deterred." *State v. Sanders*, 452 S.W.3d 300, 311 (Tenn. 2014). In other words, there is no constitutional violation when there is no state action. *Id.*

Tennessee Code Annotated section 55-10-406, permitting a law enforcement officer with probable cause to believe the operator of a motor vehicle is driving under the influence to request the operator submit to tests to determine alcohol or drug content, provides:

> nothing in this section affects the admissibility into evidence in a criminal prosecution of any analysis of the alcohol or drug content of the defendant's blood that was not compelled by law enforcement but was obtained while the defendant was hospitalized or otherwise receiving medical care in the ordinary course of medical treatment.

T.C.A. § 55-10-406(g). Indeed, this Court has upheld the use of blood test results that were obtained as part of medical treatment because there was no state action implicating the exclusionary rule. *State v. John William McCoy*, No. 9, 1991 WL 35749, at *2 (Tenn. Crim. App. Mar. 20, 1991), *perm. app. denied* (Tenn. July 1, 1991); *see also State v. Clois Dean Asbury*, No. E2008-01641-CCA-R3-CD, 2010 WL 1741365, at *10 (Tenn. Crim. App. Apr. 30, 2010), *perm. app. denied* (Tenn. Sept. 21, 2010).

In Defendant's case, she was gravely injured in a car crash and flown via LifeFlight to the hospital for medical treatment. Defendant's blood was drawn at the behest of the treating physicians, not a police officer. The evidence does not preponderate against the trial court's denial of the motion to suppress.

Defendant also argues that she had the right to independently test a blood sample whether the sample was collected by law enforcement or by medical professionals. She cites Tennessee Code Annotated section 55-10-408(a)(g) to support her proposition. Defendant insists that because she had no notice that her blood was being drawn for alcohol

testing in a criminal prosecution, she had no opportunity to have the blood sample tested independently. Defendant is simply incorrect. Tennessee Code Annotated section 55-10-408(e) provides that "[t]he person tested shall be entitled to have an additional sample of blood or urine procured and the resulting test performed by any medical laboratory of that person's own choosing and at that person's own expense." However, this section applies only to blood tests performed by a "qualified practitioner, . . . acting at the written request of a law enforcement officer." T.C.A. § 55-10-406(e)(1)(A). Again, in this case, Defendant's blood was drawn as part of her medical treatment, not at the behest of law enforcement.

Defendant also tries to argue that the State somehow committed a constitutional violation by waiting to present the matter to the grand jury until after her blood sample was destroyed. However, Defendant ignores the fact that the blood sample was taken at the request of medical professionals, not state officers.

Finally, Defendant argues that the blood sample was obtained prior to the doctor issuing orders to test the blood for blood alcohol content. As a result, she insists that the test should be suppressed. Here, the phlebotomist testified at the hearing on the motion to suppress that the blood was drawn prior to the doctor's orders based on the Defendant's injuries in order to provide the best patient care. Again, the blood sample was not taken as a result of state action. The evidence does not preponderate against the trial court's decision to deny the motion to suppress. Defendant is not entitled to relief on this issue.

*State Conference with Expert During Cross-examination*

Next, Defendant takes issue with the trial court's ex parte decision to allow the State to privately confer with its own expert witness, Mr. Daniels, during a break in his cross-examination. In particular, Defendant alleges that the State violated the rule of sequestration and gained an unfair advantage by allowing the witness to more thoroughly prepare for cross-examination. The State insists that the trial court did not abuse its discretion.

At trial, during cross-examination, Mr. Daniels was asked about an FDA recall for the machine that performed the test on Defendant's blood, the Vista 1500. The State objected on the basis that it did not have advance notice of the recall. The trial court granted a recess for Mr. Daniels to review the substance of the recall. The State asked for permission to discuss the recall with the witness. The trial court granted the request. There was no objection by Defendant.

After the recess, Mr. Daniels explained to the trial court that the recall only applied to testing for A1C, in diabetic patients, a test that was not performed by the Vista 1500 at

Skyline Medical Center. As a result of Mr. Daniels' explanation of the recall, the trial court prohibited any further cross-examination about the recall and permitted the witness to testify about why the recall was not relevant to the blood testing performed on Defendant's blood sample. There was no objection by Defendant about the communication between counsel for the State and the expert witness.

Of course, a trial court has broad discretion in controlling the course of a trial. *State v. Davidson*, 509 S.W.3d 156, 193-94 (Tenn. 2016). Review of a trial court's decisions is for abuse of discretion. *Id.* A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases a decision on a clearly erroneous assessment of the evidence, or uses reasoning that causes an injustice to the complaining party. *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015). The so-called Rule of Sequestration, found in Tennessee Rule of Evidence 615 provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

We fail to see how this rule applies to the situation about which Defendant complains. The rule prohibits witnesses from discussing their testimony with other witnesses, not counsel. Moreover, we can find no objection by counsel for Defendant as to the procedure at trial. The trial court did not abuse its discretion in allowing a witness to talk to counsel after receiving information about a recall that was not provided during discovery.

*Introduction of Defendant's Driving Record*

Defendant next argues that the trial court erred when it allowed the State to cross-examine Defendant about her driving record. Specifically, Defendant argues that the State failed to provide notice of its intent to cross-examine Defendant about her driving history and that the prejudice outweighed the probative value and was "designed to unfairly

influence the jury through the use of propensity character evidence." In other words, Defendant is arguing that the State violated Tennessee Rule of Evidence 608 and 404(b). The State argues that any error was harmless.

During Defendant's direct testimony, she testified that she did not remember the majority of her drive on the night of the wreck. Defendant insisted that she was tired and that she was not intoxicated. Defendant explained that she did not pull over to rest because of an incident with a police officer that took place when she pulled over to rest on a prior occasion. Defendant went on to explain that she was driving a rental vehicle on the night of the crash. On cross-examination, the following exchange occurred:

Q. Why were you driving a rental vehicle?
A. Because I had just got a car a few months I think it was September -- sometime in September or October of that year, and when you get on the highway going from the Demonbreun area onto 65, a white truck came over and took out, like, my fender headlight. So I had -- I had to go have that repaired. So I had a rental car during that time.
Q. Okay. So you were in a car crash?
A. Yeah. Just a fender bender, yes.
Q. Fender bender. And that would have been when?
A. I think it was a week or two before this accident.
Q. November 11th of 2016, does that sound about right?
A. Yes, ma'am.
Q. You said a truck came over and hit you?
A. Yes. And that's what I stated then.
Q. So why is that showing up on your driving history as you being at fault?
A. I don't know because there are other accidents we -- I just got -- I just found that out when going over my accident history for insurance reasons. There was also an accident on there that says I'm at fault and I wasn't driving my vehicle. It was on the back of a tow truck.
Q. When was that accident?
A. I couldn't tell you the exact day.
Q. Would that one have been July 5th of 20- I'm sorry, May 24th of 2012?
A. I don't know. I couldn't tell you an exact date. . . .

The State continued questioning Defendant about several accidents in which she was involved. Eventually, counsel for the State sought to enter a certified copy of Defendant's driving history as an exhibit. Counsel for Defendant objected. During a jury out discussion, counsel for Defendant argued that the driving record was appropriate to use for impeachment purposes but that it was "entirely inappropriate and highly prejudicial" to enter as an exhibit. The State argued that Defendant opened the door when she "started

- 13 -

talking about prior crashes and looking at her driving history with her insurance agent." The trial court determined that Defendant could be questioned about her driving record because it "goes to her credibility as a witness" but that the driving record would not be "passed to the jury" as an exhibit.

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). A trial "court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a). "The scope of cross-examination is largely within the discretion of the trial court; that discretion will not be disturbed absent abuse." *State v. Lewis*, 803 S.W.2d 260, 262 (Tenn. Crim. App. 1990). "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b). The right to effective cross-examination is subject to harmless error review. *Delaware v. Van Arsdall*, 475 U.S. 673, 680-81 (1986); *Howell*, 868 S.W.2d at 252-53; *Momon v. State*, 18 S.W.3d 152, 167 (Tenn. 1999).

Of course, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible, *see* Tenn. R. Evid. 402, but "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is generally defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Additionally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). Under Rule 404(b), the evidence must be excluded "if its probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(4).

Finally, Tennessee Rule of Evidence 608(b) provides, "specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . be inquired into on cross-examination." Tenn. R. Evid. 608(b). Before allowing such cross-examination to take place, the trial court, upon request, must hold a hearing outside the presence of the jury to determine whether the probative value of the alleged conduct outweighs its

prejudicial effect and whether there is a factual basis for the inquiry. *Id.*; *State v. Morgan*, 541 S.W.2d 285, 390 (Tenn. 1976).

Here, Defendant testified that she did not remember much about her drive leading up to the crash. Defendant testified that she was driving a rental car because she was in an accident that was not her fault. Counsel for the State proceeded to question Defendant about that accident on cross-examination. Defendant continued to deny memory of the wreck at issue and of any other accident she had been in prior to that time. Even though the State sought to introduce Defendant's entire driving record as an exhibit, the trial court did not permit the State to introduce Defendant's driving record into evidence as an exhibit. Instead, the trial court held a jury-out hearing at which it was determined that the State could cross-examine Defendant about the driving record, including the rather lengthy history of vehicle accidents and traffic/moving violations, to attack her credibility and establish her "fitness as a driver."

In our view, Defendant opened the door for the State to attack her credibility when she testified that she did not remember the wreck at issue and testified on direct that she was driving a rental car at the time of the wreck because of a prior accident. Defendant posits that the trial court should have evaluated the admissibility of the driving record under 404(b) and failed to do so. The driving record was not entered into evidence as an exhibit. It appears from the record that the trial court, by referring to the driving record's impact on Defendant's credibility, evaluated the evidence under Rule 608 rather than 404(b). Regardless, the trial court was required to balance the probative value of the evidence with the danger of unfair prejudice. The record does not reflect that this determination was made. Despite this obvious misstep, we decline to determine that the trial court abused its discretion. The right to effective cross-examination is subject to harmless error review. *Delaware v. Van Arsdall*, 475 U.S. 673, 680-81 (1986); *Howell*, 868 S.W.2d at 252-53; *Momon v. State*, 18 S.W.3d 152, 167 (Tenn. 1999). Here, Defendant repeatedly denied remembering anything about the wreck at issue. Extraneous proof of Defendant's guilt was rather overwhelming. There were multiple 911 calls about Defendant's erratic driving, and her blood alcohol content was more than twice the legal limit. Any error in allowing the State to cross-examine Defendant about her driving record was certainly harmless. Defendant is not entitled to relief on this issue.

*Jury Question*

Lastly, Defendant argues that the trial court improperly had ex parte communication with the jury after the jury submitted a question about the reckless endangerment charge. Specifically, Defendant claims that the jury sent a note to the trial court asking about whether the reckless endangerment charge referred to the other people driving on the highway at the time of the crash or the Seepauls. The State insists that Defendant has

waived plenary review of this issue by failing to lodge a contemporaneous objection and by failing to provide an adequate record for review.

The trial court addressed the parties after receiving information that the jury had reached a verdict. The trial court informed the parties that the jury,

> wanted to know . . . if . . . count four related to the people on the highway and - - other than the other initial victims and I said yes, that's count four. It was not made - - the point wasn't made during argument to where they understood it. So I didn't want them to get mixed up. And that was the intent. Whether or not it was proved, I don't know.

Counsel for Defendant did not object at this point. Even though counsel failed to object, the issue was raised in a motion for new trial. The record on appeal does not contain the written jury question or the trial court's actual response to the question.

Tennessee Rule of Appellate Procedure Rule 36(a) provides that relief is not required for "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Moreover, Defendant, as the appellant, had a duty to "prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993); Tenn. R. App. P. 24(b). This issue is waived.

## *Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed. However, during our review, we noted that there is no judgment form in the record for Defendant's conviction for DUI. The record reflects that the trial court merged the DUI conviction with the two convictions for vehicular assault. Despite the merger, there should be a judgment form indicating the merger. On remand, the trial court should enter a judgment form for this count.

_____
TIMOTHY L. EASTER, JUDGE